132 So.2d 845

**LEITER MINERALS, INC.**

v.

**CALIFORNIA CO., Allen L. Lobrano and Mrs. Ethel M. Fontennelle Lobrano, Individually and as Natural Tutrix of Her Minor Children, Robert Leo Lobrano and Karen Katherine Lobrano.**

No. 45527.

June 29, 1961.

Rehearing Denied Oct. 4, 1961.

Plauché & Plauché, S. W. Plauché, Jr., Lake Charles, for plaintiff-applicant.

Charles D. Marshall, Eugene D. Saunders, New Orleans, for defendants-respondents.

Tucker, Bronson & Martin, H. M. Holder, Shreveport, as amicus curiae.

HAWTHORNE, Justice.

On December 21, 1938, Thomas Leiter sold to the United States of America a tract of land in Plaquemines Parish, Louisiana, containing 8,711 acres more or less, for a recited consideration of $25,000.[1] In this act of sale there is the following mineral reservation:

"The Vendor reserves from this sale the right to mine and remove, or to grant to others the right to mine and remove, all oil, gas and other valuable minerals which may be deposited in or under said lands, and to remove any oil, gas or other valuable minerals from the premises; the right to enter upon said lands at any time for the purpose of mining and removing said oil, gas and minerals, said right, subject to the conditions hereinafter set forth, to expire April 1, 1945, it being understood, however, that the vendors will pay to the United States of America, 5% of the gross proceeds received by them as royalties or otherwise from all oil or minerals so removed from in or under the aforedescribed lands, until such time as the vendors shall have paid to the United States of America, the sum of $25,000, being the purchase price paid by said United States of America for the aforedescribed properties.

"Provided, that if at the termination of the ten (10) year period of reservation, it is found that such minerals, oil and gas are being operated and have been operated for an average of at least 50 days per year during the preceding three (3) year period to commercial advantage, then, in that event, the said right to mine shall be extended for a further period of five (5) years, but that the right so extended shall be limited to an area of twenty-five acres of land around each well or mine producing, and each well or mine being drilled or developed at time of first extension, to-wit: April 1, 1945.

---

1. This tract was acquired for use as a wild life refuge. See United States v. Leiter Minerals, D.C., 127 F.Supp. 439, 440. It is presumably part of the "Delta Migratory Water Fowl Refuge", which, from an official map of the State of Louisiana in the Department of Public Works, appears to encompass more than 50,000 acres.

"Provided, that this said right to mine as previously stated shall be further extended from time to time for periods of five (5) years whenever operation during the preceding five (5) year period has been for an average of 50 days per year during this period, and

"Provided that at the termination of the ten (10) year period of reservation, if not extended, or at the termination of any extended period in case the operation has not been carried on for the number of days stated, the right to mine shall terminate, and complete fee in the land become vested in the United States.

"The reservation of the oil and mineral rights herein made for the original period of ten (10) years and for any extended period or periods in accordance with the above provisions shall not be affected by any subsequent conveyance of all or any of the aforementioned properties by the United States of America, but said mineral rights shall, subject .to the conditions above set forth, remain vested in the vendors."

Approximately 18 months after the date of the deed containing this mineral reservation, the Louisiana Legislature of 1940 adopted Act 315, now R.S. 9:5806, which reads in part as follows:

"Section 1. Be it enacted by the Legislature of Louisiana, That when land is acquired by conventional deed or contract, condemnation or expropriation proceedings

by the United States of America, or any of its subdivisions or agencies, from any person, firm or corporation, and by the act of acquisition, verdict or judgment, oil, gas and/or other minerals or royalties are reserved, or the land so acquired is by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas and/or other minerals or royalties, still in force and effect, said rights so reserved or previously sold shall be imprescriptible."

Neither Thomas Leiter nor his successors in title have exercised the rights reserved in the 1938 deed to the government. In March, 1949, the United States granted to Frank J. and Allen L. Lobrano oil, gas, and mineral leases covering portions of the property described in its deed of acquisition. Under these leases the California Company has developed the property, and as of February, 1958, there were more than 80 wells on this land producing over 7,500 barrels of oil per day. From this production the United States has been paid royalties of more than $3,500,000.

For an understanding of the problem before us it is necessary to outline the history of the litigation that gave rise to this declaratory judgment suit with which we are here concerned.

In 1953 Leiter Minerals, Inc., instituted a petitory action in the district court for Plaquemines Parish, Louisiana, to have itself declared owner of the mineral rights

under the tract of land sold to the United States in 1938 by Thomas Leiter, the corporation's predecessor in title. Named as defendants were the California Company and Lobrano in their capacity as lessees of the United States government; the United States was not a party to the suit. While Leiter's suit was pending in the Louisiana court, the United States instituted an action in the United States District Court for the Eastern District of Louisiana, asserting its title to these mineral rights and seeking an injunction to restrain Leiter Minerals, Inc., plaintiff in the suit in the state court, from litigating its claim in that court. See United States v. Leiter Minerals, Inc. et al., D.C., 127 F.Supp. 439. On appeal the United States Fifth Circuit Court of Appeals concluded that the federal district court was vested with exclusive jurisdiction to determine title to the mineral rights claimed by Leiter, and that the United States district judge was right in causing a preliminary injunction to issue. See 224 F.2d 381.

The United States Supreme Court, having granted certiorari, held that the United States district court properly exercised its jurisdiction to entertain the suit filed there, and that the granting of the preliminary injunction by that court was proper. See Leiter Minerals, Inc., v. United States, 352 U.S. 220, 77 S.Ct. 287, 292, 1 L.Ed.2d 267. The Supreme Court, however, modified the judgment of the Court of Appeals to permit an interpretation of Louisiana Act 315 of 1940 by the state court, saying:

"The Government contends that Act No. 315 of 1940 does not apply when the parties themselves have contracted for a reservation of specific duration and that if the statute is construed to apply to this situation, it would impair the obligation of the Government's contract. Petitioner disagrees. The Supreme Court of Louisiana has never considered the specific issue or even discussed generally the rationale of the statute, especially with reference to problems of constitutionality. The District Court recognized the importance of the statute in deciding this case; it also recognized that a problem of interpretation was involved, that the statute cannot be read by him who runs. What are the situations to which the statute is applicable? Is the statute merely declaratory of prior Louisiana law? What are the problems that it was designed to meet? The answers to these questions are or may be relevant. Before attempting to answer them and to decide their relation to the issue in the case, *we think it advisable to have an interpretation, if possible, of the state statute by the only court that can interpret the statute with finality, the Louisiana Supreme Court.* The Louisiana declaratory judgment procedure appears available to secure such an interpretation, La.Rev.Stat., 1950, 13:4231 et seq., and the United States of course may appear to

urge its interpretation of the statute. See Stanley v. Schwalby, 147 U.S. 508, 512, 513, 13 S.Ct. 418, 419, 420, 37 L.Ed. 259. It need hardly be added that the state courts in such a proceeding can decide definitively only questions of state law that are not subject to overriding federal law.

"We therefore modify the judgment of the Court of Appeals to permit an interpretation of the state statute to be sought with every expedition in the state court in conformity with this opinion." (Italics ours.)

The proceeding presently before us was instituted by Leiter Minerals, Inc., under the Louisiana Declaratory Judgments Act, Arts. 1871–1883, La.Code Civ.Proc., pursuant to the above quoted directive of the Supreme Court of the United States. Named as defendants are the Lobranos and the California Company; the United States is not a party to this proceeding.

The state district court in which this suit was filed concluded that Act 315 of 1940 applied to the mineral reservation contained in Leiter's deed to the United States, that the mineral rights so reserved were rendered imprescriptible by the act, and that the act was not unconstitutional in any respect. On appeal the Louisiana Fourth Circuit Court of Appeal reversed the state district court and decreed "that Act 315 of 1940 (LSA–R.S. 9:5806) does not apply in this case since the mineral reservation is of specific ex contractu duration, less than

the prevailing statutory period of 10 years for non-user". See Leiter Minerals, Inc., v. California Co. et al., La.App., 126 So.2d 76, 82. On application of plaintiff Leiter we granted a writ of certiorari.

 To us it is evident that in this action, instituted pursuant to the directive of the United States Supreme Court under the Louisiana Declaratory Judgments Act, we are called upon to render only an advisory opinion. As between litigants this court has consistently refused to render advisory opinions under the Declaratory Judgments Act, for even under this act there must be a justiciable controversy, which does not exist in this proceeding. Tugwell v. Members of Board of Highways, 228 La. 662, 83 So.2d 893 (on rehearing), and numerous authorities there cited. Furthermore, it is proper for us to refuse a declaratory judgment or decree where such a judgment or decree would not terminate the uncertainty or the controversy giving rise to the proceeding. Art. 1876, La. Code Civ.Proc. Our opinion here will not terminate the uncertainty or the controversy existing between the parties to the instant suit. This case is unusual, however, in that the highest court in the land deems it "advisable" for us to render such an opinion. Therefore, out of respect for, and as a courtesy to, that court, we proceed to do so, in the hope that our opinion will be of some assistance to the United States Supreme Court in its solution of the funda ·

mental question raised in the litigation pending in the federal courts. Moreover, there can be no doubt that there is a real controversy as to the ownership of the mineral rights in the suits pending in the federal and state courts.

■ As we view the matter, both the Louisiana district court and the Louisiana Court of Appeal went far beyond the directive of the United States Supreme Court, as our state courts were not asked to interpret or construe the reservation of the mineral rights in the deed to the United States. In this connection, however, we cannot help but observe that the Court of Appeal in reaching its conclusion did not consider the entire reservation but concentrated its whole attention on a single date in it. In this it was in error, for under Article 1955 of our Civil Code "All clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act". For this reason the decision of the Court of Appeal on this point should not be given any weight.

■ It is apparent that the fundamental question raised both in Leiter's first suit in the state court, which has been stayed by the preliminary injunction, and in the government's suit in the federal court is whether the mineral servitude created by Leiter's reservation of the mineral rights in the 1938 deed to the United States was rendered imprescriptible by Louisiana Act 315 of 1940, R.S. 9:5806. No court can answer this question without determining what the parties to the deed intended by the mineral reservation. The intention of the parties should be ascertained from the instrument itself without the aid of extrinsic evidence, but if the instrument is so ambiguous that there is doubt as to what the parties intended, extrinsic evidence may be resorted to as an aid in interpretation. La.Civ.Code Art. 1956; Plaquemines Oil & Development Co. v. State of Louisiana, 208 La. 425, 23 So.2d 171. We are mindful, however, that the interpretation of this reservation is for the United States courts, and not for us in this proceeding, even though Leiter's petition in this suit, after praying for an interpretation of Act 315 of 1940 as outlined in the opinion of the Supreme Court, asks the court to declare that Act 315 of 1940 applies to the mineral reservation in the deed to the government.

Our only task is to interpret Act 315 of 1940. To do so intelligently it is necessary for us first to set forth certain general principles of law pertaining to mineral reservations. When these general principles are understood, the purpose of the act and the problems it is designed to meet are readily ascertainable.

■ In this state oil and gas in place are not subject to absolute ownership as specific things apart from the soil of which

they form a part; in other words, in Louisiana there is no separate estate in or ownership of oil and gas in place. Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207. The sale or reservation of mineral rights does not vest in the one buying or reserving them an estate in the minerals; it creates only a right to go upon the land and produce the minerals, and establishes a *servitude* upon the land. Rives v. Gulf Refining Co., 133 La. 178, 62 So. 623; Frost-Johnson Lumber Co. v. Nabors Oil & Gas Co., 149 La. 100, 88 So. 723; Wemple v. Nabors Oil & Gas Co., 154 La. 483, 97 So. 666; Ware v. Baucum, 221 La. 259, 59 So.2d 182. Such a servitude can be created only by the owner of the land. La.Civ.Code Arts. 743, 770; Bourg v. Hebert, 224 La. 535, 70 So.2d 116, and cases there cited. The mineral servitude established either by sale or by reservation is extinguished by the prescription resulting from non-user of the servitude for 10 years following its creation. La.Civ. Code Arts. 783(2), 789, 3546; Lynn v. Harrington, 193 La. 877, 192 So. 517; Sellington v. Producers' Oil Co., 152 La. 81, 92 So. 742; Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207 (on second rehearing). Use or exercise of the servitude will preserve it for another period of 10 years. Lee v. Giauque, 154 La. 491, 97 So. 669; Louisiana Petroleum Co. v. Broussard, 172 La. 613, 135 So. 1.

Over the years the federal government has acquired huge tracts of land in this state for such purposes as wild life and game refuges, national forests, spillways, military installations, and camps, and it is now the largest landowner in this state. Some of the tracts acquired for these purposes contain as much as a half-million acres. These various tracts were bought by the government at a relatively low price per acre, evidently because the vendors in most cases reserved the mineral rights, which were, potentially at least, much more valuable than the lands, and the federal government in such sales where the mineral rights were reserved did not expect or intend to acquire the mineral rights. The government, however, had some difficulty in acquiring these lands as their owners did not wish to sell unless they could reserve the oil and gas for a longer period than 10 years without use. In some cases the agents of the United States advised the vendors that the Louisiana law of prescription for non-use did not apply to lands purchased by the United States, and some sales could not have been effected by the government if its representatives had taken the position that the Louisiana law of prescription applied. The government did not have this particular problem in purchasing lands in other states because no restriction prevented the landowners there from reserving the minerals in perpetuity. Under these circumstances the Louisiana

Legislature adopted Act 315 of 1940 to preserve to the vendors the mineral rights in tracts sold to the government and to facilitate the government's acquisition of lands in Louisiana. Thus, one of the primary purposes of Act 315 of 1940 was to keep prescription from running against mineral rights which were reserved when the land was sold to the United States. These facts and circumstances are shown in a decision of the United States district court, United States v. Nebo Oil Co., D.C., 90 F.Supp. 73.

There can be no doubt, however, that there were other objects and purposes for the enactment of Act 315 of 1940, which made mineral rights in lands sold to the government imprescriptible and thereby preserved these mineral rights in the vendors.

One of the important sources of revenue of the State of Louisiana is the severance tax which is levied and collected by the state when natural resources such as oil and gas are produced and extracted from the land. If the mineral rights were owned by the federal government in lands which the government had purchased, the mineral owner's share of the oil and gas produced from these lands would not be subject to taxation by the State of Louisiana, and the state would be deprived of large sums in taxes, especially since an immense area is owned by the federal government in oil-pro-ducing sections of this state, as the very facts of this case disclose.

■ Moreover, the State of Louisiana in the exercise of its police power has authority to protect, conserve, and replenish the natural resources of the state and to prohibit and prevent their waste. See Art. 19, Sec. 18, and Art. 6, Sec. 1, La.Const. of 1921. Under this power the Legislature has adopted laws regulating and controlling the production of oil and gas within the state. By making mineral rights imprescriptible in lands sold to the government and retaining these rights in the vendors, Act 315 of 1940 avoided a possible conflict by the state in the exercise of its police power with the federal government.

Counsel for the lessees of the United States contend that the mineral reservation in the deed established a servitude for a certain time, or a servitude of specific duration, and that under this interpretation the act is without application; that if the act were applied so as to make this servitude imprescriptible, the statute would be unconstitutional.

On the other hand, counsel for Leiter contend that the mineral reservation did not establish a servitude for a certain time or of specific duration, but established a servitude of uncertain and indefinite duration; that the parties to the deed fixed by contract a period of liberative prescription, as they were free to do; that before ac-

crual of this conventional period of prescription the Legislature adopted the act which rendered the mineral servitude imprescriptible; that under this interpretation of the contract the act is applicable and constitutional.

As we have pointed out, we ourselves cannot construe the reservation in this proceeding; we can only give the law applicable under each of the two interpretations urged by counsel.

■ If the United States Supreme Court construes the reservation as one establishing a servitude for a certain time or of specific duration, as argued by the lessees of the United States, then Act 315 of 1940 is not applicable and if applied would be unconstitutional.

■ Under the laws of this state which we have cited and discussed, a reservation of minerals or mineral rights does not vest in the one reserving them an estate in the minerals; it creates only a servitude upon the land, the right to go upon the land and produce the minerals therefrom. Under Louisiana law servitudes can be established for a certain time. Article 821 of our Civil Code provides: "Servitudes are also extinguished when they have been established for a certain time only, or under a condition that in a certain event they shall cease; for when the time expires, or the event takes place, the servitude becomes extinguished of right." Article 783(6) provides

that servitudes are extinguished by the expiration of the time for which the servitude was granted or by the happening of the dissolving condition attached to the servitude. An example of a servitude established for a certain time (a servitude of specific duration) is that created by the mineral reservation in the case of Hodges v. Norton, 200 La. 614, 8 So.2d 618. Counsel for the government's lessees argue that the mineral reservation in that case is similar to the reservation in the Leiter deed. For what it may be worth, our opinion is that it is not.

If a servitude is established for 10 years or less, it will remain in force for the time so stipulated regardless of whether it is used by the servitude owner. In such a case no question of prescription arises because the servitude would expire by the terms of the contract before it could ever be lost by the 10-year prescription for non-user.

■ On the other hand, if the servitude is established for a definite period in excess of 10 years, for example, for 15 or 20 years, the servitude would remain in force for the entire period of 15 or 20 years provided the owner of the servitude did not permit a 10-year period to elapse without exercise of the right or servitude and thus lose it by the prescription of 10 years. La. Civ.Code Arts. 783(2), 789, 3546. Even if the right or servitude has been exercised,

however, the servitude would expire and become extinguished at the end of the 15 or 20 years for which it was established. La.Civ.Code Arts. 821, 783(6).

Act 315 of 1940 makes imprescriptible mineral rights reserved in lands acquired by the United States, and where the reservation has been definitely fixed for a certain period in excess of 10 years, the right so reserved remains in full force and effect for the entire period specified even without use by the servitude owner; or, in other words, under the act the right is not lost by the vendor in such a case by the 10-year prescription of non-use. In such a case, however, the servitude would expire at the end of the time fixed for its duration regardless of whether it was being used at that time or not.

■ Where mineral rights in lands sold to the United States government are reserved for a certain, definite, and fixed time in the contract, or, in other words, where the servitude has been established for a certain or fixed time, at the expiration of the time fixed the servitude is lost or extinguished; and since in such a case there is no question of prescription, Act 315 of 1940 is without application. If the act should be held to be applicable in such a case so as to extend the right or servitude beyond the time fixed by the contract for its duration, the act would operate to impair the obligation of the contract between the parties and to divest vested rights, and hence would be unconstitutional. Art. 4, Sec. 15, La.Const. of 1921.

■ If the United States Supreme Court concludes, as argued by counsel for Leiter, that the reservation does not establish a servitude for a certain time or of specific duration but establishes one of uncertain and indefinite duration, and that it was the intention of the parties to fix by contract the period of liberative prescription, then Act 315 of 1940 is applicable and constitutional.

Counsel for Leiter argue with much force that the reservation does not establish a servitude for a fixed or certain time. If this is true, the Louisiana law on servitudes of specific duration, set forth by us above in our discussion of the government's lessees' contention, is without application.

■ Most mineral servitudes are not established for a fixed time. A servitude of indefinite duration is extinguished only when it is not exercised for a period of 10 years. Such a servitude created by mineral reservation in a sale to the government would, under Act 315 of 1940, be rendered imprescriptible and would never be lost by prescription, provided it was in existence at the time the 1940 act went into effect.

■ Parties to a contract are free to stipulate as they please so long as their stipulations are not contrary to good mor-

als or public policy or do not violate some law. La.Civ.Code Arts. 1764, 1895, 1901; American Cotton Co-op. Ass'n v. New Orleans & Vicksburg Packet Co., 180 La. 836, 157 So. 733; Mente & Co. v. Roane Sugars, Inc., 199 La. 686, 6 So.2d 731; Givens v. Washington Nat. Ins. Co., La.App., 170 So. 810; Morris Buick Co. v. Ray, La.App., 43 So.2d 83. It has also been recognized in this state, and by the courts of other states and the Supreme Court of the United States, that those entering into a contract may stipulate a different period of prescription or limitation from that provided by a state statute, and that the limitation or prescriptive period as thus stipulated, if reasonable, will be binding upon the parties. Blanks v. Hibernia Ins. Co., 36 La.Ann. 599; Ray v. Liberty Industrial Life Ins. Co., La.App., 180 So. 855; see Order of United Commercial Travelers of America v. Wolfe, 331 U.S. 586, 67 S.Ct. 1355, 91 L.Ed. 1687 (in the absence of a controlling statute to the contrary); Hoagland v. Railway Express Agency, Fla., 75 So.2d 822. See also Wood, Limitation of Actions, v. I, p. 145, sec. 42 (4th ed. 1916).

■ In this state, however, parties to a contract are not permitted to establish a longer prescription for loss of mineral rights through non-use than the 10-year period established by the Civil Code for the loss of a servitude through non-use, because it is against the public policy of this state to allow such servitudes to remain alive for a longer period than 10 years without use. Nevertheless contracting parties are at liberty to establish a contractual period of prescription for the conditional extinguishment of the servitude through non-use, provided the period is 10 years or less.

■ As we have previously stated, one of the primary objects of Act 315 of 1940 was to prevent the federal government from acquiring mineral rights by prescription in this state when those rights were reserved in sales to it, and the act in plain language provides that such rights "shall be imprescriptible". The act draws no distinction between statutory and contractual prescription, and, as we view the matter from the history of the act and the objects and purposes for which it was adopted, it is manifest that the Legislature intended the act to be applicable to prescription whether established by statute or by contract where prescription had not already accrued at the time the act became effective. See Ray v. Liberty Industrial Life Ins. Co., La.App., 180 So. 855.

This court has already held that Act 315 of 1940 is applicable to mineral reservations in all sales which were made to the United States before its adoption provided the prescriptive period had not expired before the act became effective; or, stated somewhat differently, this court has concluded that the statute was a remedial one and was retrospective in its operation.

Whitney Nat. Bank of New Orleans v. Little Creek Oil Co., Inc. et al., 212 La. 949, 33 So.2d 693. See also United States v. Nebo Oil Co., D.C., 90 F.Supp. 73; 5 Cir., 190 F.2d 1003.

Act 315 of 1940 does not violate Article 4, Section 15, of the Louisiana Constitution of 1921, which provides that vested rights shall not be divested and that no law impairing the obligation of contracts shall be passed.

■ In this state when property is conveyed and the mineral rights are reserved, the party reserving the minerals is vested with a real right, the right to go upon the land and produce the minerals. In such a case the purchaser of the land subject to this servitude does not acquire the mineral rights, the ownership of which is vested in the vendor. As to the minerals, all the purchaser has acquired is the expectancy or hope that the mineral servitude will be extinguished by the 10-year prescription of non-use and will not be extended or continued by use beyond this period. Where the minerals have been reserved, the purchaser of the land pays nothing for them and has no vested right in them. As said by this court in Tennant v. Russell, 214 La. 1046, 39 So.2d 726, 728, "A right is *vested* when 'the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. The right must be absolute, complete, and unconditional, independent of a contingency, and a mere expectancy of future benefit, or a contingent interest in property * * * does not constitute a vested right.' 16 C.J.S. Constitutional Law § 215, page 642." See also United States v. Nebo Oil Co., D.C., 90 F.Supp. 73; 5 Cir., 190 F.2d 1003.

In United States v. Nebo Oil Co., supra, both the United States district court and the United States Court of Appeals concluded that Act 315 of 1940 did not impair the obligation of contracts in contravention of the federal Constitution, and cited numerous authorities in support of this conclusion. For the reasons there given we conclude that Act 315 of 1940 does not violate the corresponding, identical provision of the Louisiana Constitution.

To summarize in conclusion, it is our view, and we hold: First, that if the reservation in the Leiter deed is construed as establishing a mineral servitude for a definite, fixed, and specified time which has elapsed, then Act 315 of 1940 is not applicable and cannot be constitutionally applied; and second, that if the reservation is construed as not establishing a servitude for a fixed, definite and certain time, and if it is decided that the provisions of the reservation show that the parties were stipulating for a period of contractual prescription for the conditional extinguishment of the mineral servitude created, then Act 315 of 1940 is applicable and constitutional.

The interpretation of the contract is for the United States courts.

In the instant proceeding both the state district court and the state Court of Appeal, as we have pointed out, went beyond the Supreme Court's directive when they construed the contract. Accordingly we think that the judgment of both courts should be annulled, reversed, and set aside, and that the proper decree is merely to dismiss plaintiff's suit.

For the reasons assigned both the judgment of the district court and the judgment of the Court of Appeal are annulled, reversed, and set aside, and plaintiff's suit is dismissed. All costs of this proceeding are to be paid one-half by plaintiff and one-half by defendants.

FOURNET, Chief Justice (dissenting in part and concurring in part).

While I recognize that this litigation was instituted under the Louisiana Declaratory Judgments Act, Articles 1871–1883 of the Louisiana Code of Civil Procedure, pursuant to a directive of the United States Supreme Court, I cannot subscribe to the majority view that because of this fact we are called upon to render only an advisory opinion in this case and that, accordingly, "both the Louisiana district court and the Louisiana Court of Appeal went far beyond the directive of the United States Supreme Court, as our courts were not asked to in-

terpret or construe the reservation of the mineral rights in the deed to the United States."

And while it is equally true that the federal courts may not choose to follow any decree we may render herein, although it is a generally accepted procedure for the federal courts to follow the decisions of the highest courts of the respective states in the interpretation of their laws where such decisions violate no provision of the United States constitution, I know of no authority or right this court has empowering it to render an "advisory" opinion under the Declaratory Judgments Act, as is being done by the majority here. In my humble opinion, not only is the authority of this court limited by the Louisiana constitution in such cases to a review of the decisions of the lower courts of this state, but the constitution also imposes an obligation and duty upon this court to review such cases in all of their aspects.

The fact that the case under consideration here was instituted because of the suggestion, or directive, to be found in the decision of the United States Supreme Court does not change the character of the declaratory judgments action, nor does it enlarge or decrease the prerogatives of this court under the circumstances any more than would be the case if bonding attorneys in a given case were to require a decision of this court on the question of the constitutionality of the issuing authority for such

bonds. The procedure would be identical to that in the instant case, as the action would have to be instituted in a district court of competent jurisdiction, and it could only reach this court (1) on appeal, in the event the act involved were to be found unconstitutional in the lower court; or (2) on a writ, as in the instant case, to review a judgment of an intermediary appellate court.

For the purpose of the record, however, I wish to state that I am of the view the majority opinion has properly construed the statute in question, its applicability, and its constitutionality. I am further of the view that the matter was properly resolved by the district judge, whose opinion is quoted in full by Mr. Justice HAMLIN in his dissent.

HAMLIN, Justice (dissenting).

I am compelled to dissent from the majority opinion.

The Leiter Minerals, Inc., applicant for writs herein, submits that the judgment of the Court of Appeal, Fourth Circuit, should be reversed and the judgment of the district court reinstated.

Since I agree with the contention of the applicant, and believing that the unpublished opinion of the district court is eminently sound in law and correctly sets at rest the issues involved herein, I adopt it as my dissent:

"This is a declaratory judgment action brought by the Plaintiff, The Leiter Minerals, Inc., a Louisiana corporation, against the defendants, The California Company, Allen L. Lobrano and Mrs. Ethel M. Fontenelle Lobrano, individually and as natural tutrix of her minor children, Robert Leo Lobrano and Karen Katherine Lobrano, pursuant to the decision of the U. S. Supreme Court which was rendered on January 14, 1957. The Leiter Minerals, Inc. v. United States, 352 U.S. 220, 1 L.ed.2d 267, 77 S.Ct. 287.

"For the purposes of this decision, the following summary of the litigation is sufficient:

"The Leiter Minerals, Inc., as successor in title to Thomas Leiter, claims to be the owner of the minerals under a large tract of land in Plaquemines Parish, Louisiana. The claim of Plaintiff is based on a reservation made by Thomas Leiter in a sale of the land to the United States of America on December 21, 1938, recorded in Plaquemines Parish Conveyance Book 112, Folio 479. The pertinent portion of the mineral reservation insofar as the present litigation is concerned reads as follows:

" 'The Vendor reserves from this sale the right to mine and remove, or to grant to others the right to mine and remove, all oil, gas and other valuable minerals which may be deposited in or under said lands, and to remove any oil, gas or other valuable min-

erals from the premises; the right to enter upon said lands at any time for the purpose of mining and removing said oil, gas and minerals, said right, subject to the conditions hereinafter set forth, to expire April 1, 1945, it being understood, however, that the vendors will pay to the United States of America, 5% of the gross proceeds received by them as royalties or otherwise from all oil or minerals so removed from in or under the aforedescribed lands, until such time as the vendors shall have paid to the United States of America, the sum of $25,000 being the purchase price paid by said United States of America for the aforedescribed properties.

" 'Provided, that if at the termination of the ten (10) year period of reservation, it is found that such minerals, oil and gas are being operated and have been operated for an average of at least 50 days per year during the preceding three (3) year period to commercial advantage, then and in that event, the said right to mine shall be extended for a further period of five (5) years, but that the right so extended shall be limited to an area of twenty-five acres of land around each well or mine producing, and each well or mine being drilled or developed at time of first extension, to-wit: April 1, 1945.

" 'Provided, that this said right to mine as previously stated shall be further extended from time to time for periods of five (5) years whenever operation during the preceding five (5) year period has been for an average of 50 days per year during this period, and

" 'Provided that at the termination of the ten (10) year period of reservation, if not extended, or at the termination of any extended period in case the operation has not been carried on for the number of days stated, the right to mine shall terminate, and complete fee in the land become vested in the United States.

" 'The reservation of the oil and mineral rights herein made for the original period of ten (10) years and for any extended period or periods in accordance with the above provisions shall not be affected by any subsequent conveyance of all or any of the aforementioned properties by the United States of America, but said mineral rights shall, subject to the conditions above set forth, remain vested in the vendors.'

"In 1940 the Legislature of Louisiana passed Act 315 dealing with reservations of mineral rights that were involved in sales to the government or in condemnation proceedings by the government. The relevant sections of the Act read as follows:

" 'Section 1. Be it enacted by the Legislature of Louisiana, That when land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the United States of America, or any of its subdivisions or agencies, from any per-

son, firm or corporation, and by the act of acquisition, verdict or judgment, oil, gas, and/or other minerals or royalties are reserved, or the land so acquired is by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas and/or other minerals, or royalties, still in force and effect, said rights so reserved or previously sold shall be imprescriptible.'

"Plaintiff, in 1953, filed a petitory action in this Court against the California Company and others, asserting the Plaintiff's title to the minerals under the above reservation.

"The subsequent history of the case shows that after the petitory action had been pending in this Court for several months and after this Court had rendered a decision overruling all of Defendants' exceptions in the petitory action, the United States government filed a suit in the Federal Court in New Orleans and obtained a preliminary injunction against the Plaintiff proceeding in the petitory action. The injunction suit in the Federal Court finally went to the U. S. Supreme Court, which, on January 14, 1957, rendered its said decision, and modified the injunction which had previously been granted by the lower Federal courts and permitted the parties to file a declaratory judgment suit in the Louisiana State court so as to obtain an interpretation of the 1940 statute by the Louisiana Supreme Court. The following language of the U. S. Supreme Court's decision is quoted as follows:

" 'The Government contends that Act No. 315 of 1940 does not apply when the parties themselves have contracted for a reservation of specific duration and that if the statute is construed to apply to *this situation* [1] it would impair the obligation of the Government's contract. Petitioner contests these contentions. The Supreme Court of Louisiana has never considered the specific issue or even discussed generally the rationale of the statute, especially with reference to problems of constitutionality. The District Court recognized the importance of the statute in deciding this case; it also recognized that a problem of interpretation was involved, that the statute cannot be read by him who runs. What are the situations to which the statute is applicable? Is the statute merely declaratory of prior Louisiana laws? What are the problems that it was designed to meet? The answers to these questions are, or may be, relevant. Before attempting to answer them and to decide their relation to the issues in the case, we think it advisable to have an interpretation, if possible, of the state statute by the only court that can in-

1. It is my view that the words "this situation" mean the situation prevailing in the instant case and that we must look into and interpret the provisions of the contract; otherwise, we are not completely answering the questions propounded by the United States Supreme Court.

terpret the statute with finality, the Louisiana Supreme Court. The Louisiana declaratory judgment procedure appears available to secure such an interpretation, La Rev Stat, 1950 Sect 13–4231 et seq., and the United States of course may appear to urge its interpretation of the statute. See Stanley v. Schwalby, 147 U.S. 508, 512, 513, 37 L.ed. 259, 261, 262, 13 S.Ct. 418. It need hardly be added that the state courts in such a proceeding can decide definitely only questions of state law that are not subject to overriding federal law. [Emphasis mine.]

" 'We therefore modify the judgment of the Court of Appeals to permit an interpretation of the state statute to be sought with every expedition in the state court in conformity with this opinion.'

"This suit was filed by the Plaintiff in compliance with the U. S. Supreme Court decision and was tried before this Court on March 11, 1959. The matter has now been submitted to the Court upon written briefs filed by the parties.

"A decision in this matter by this Court has been made much easier by reason of the fact that both the Supreme Court of Louisiana and the U. S. Court of Appeals for the 5th Circuit have previously rendered decisions construing Act 315 of 1940 in a number of respects helpful to a proper decision in the present case. The decisions referred to are the case of Whitney National

Bank of New Orleans vs. Little Creek Oil Co., 212 La. 949, 33 So.2d 693 and U. S. vs. Nebo Oil Co., 190 F.2d 1003. In the latter decision, the U. S. 5th Circuit Court of Appeals affirmed the comprehensive opinion of District Judge Gaston L. Porterie in the lower court. See U. S. vs. Nebo Oil Co. [D.C.], 90 F.Supp. 73.

"The fact that the deed from Thomas Leiter to the U. S. was executed prior to the passage of Act 315 of 1940 does not make the 1940 Act inapplicable to the previously executed sale and mineral reservation.

"In the Whitney National Bank [of New Orleans] vs. Little Creek Oil Co. case and in the U. S. vs. Nebo Oil Company decision, both the State and the Federal Courts, squarely held that the 1940 Act was retrospective in its operation. It should be noted that in both of the above cases, the sales and reservations were made a much longer period prior to the 1940 Act than Leiter's sale and mineral reservation in the present case.

"It is this Court's opinion, therefore, that since both the Louisiana Supreme Court and the Federal Courts have held Act 315 of 1940 to be retrospective, it clearly applies to Leiter's 1938 mineral reservation.

"There remains only two additional points, which this Court feels it must consider in deciding this case.

"The first question is whether the Act applies to the 1938 mineral reservation quoted above in view of the language used therein. The next and final question is, if the 1940 Act applies to Leiter's 1938 reservation and thereby renders the mineral reservation imprescriptible, whether the Act is unconstitutional.

"On the first point, in view of the very broad and comprehensive language in the 1940 act and the apparent objective which the Legislature had in mind when it passed the Act, it seems plain to this Court that the 1940 Act is fully applicable to Leiter's mineral reservation.

"It is well recognized, both in this State and in other jurisdictions, that the parties to a contract can establish a period of limitation or prescription. It is clearly within the Legislature's power to enact legislation which affects equally all prescriptions, both statutory and conventional. If the Legislature intended to limit Act 315 to the 10 yr. prescriptive period established by the Civil Code of Louisiana, the Legislature would have indicated its purpose to so limit the scope of the Act.

"Not only is there no language in the 1940 Act which would indicate the Legislature's purpose to qualify or limit the application of the Act but the obvious public policy of the State as demonstrated by the passage of that Act makes it unreasonable to believe that the Legislature had in mind

any limited application of the Act. Judge Porterie, in the Nebo case used the following language:

" 'Moreover, the Federal Government is the largest landowner in Louisiana, and the dedication of large tracts for public purposes, such as forests and game preserves, withdraws these lands from commerce. It would appear entirely reasonable under these circumstances for the Louisiana Legislature to do all in its power to preserve the mineral rights in its citizens.'

"It was held, in Ray vs. Lib. Ind. Life Ins. Co. [La.App.] 180 So. 855, that a 1932 statute dealing with the subject of interruption of prescription and which, similar to the case here, did not limit the scope of its application, applied to conventional as well as statutory prescription.

"In 1938, when Leiter sold to the government and reserved the mineral rights, the government had no assurance that the mineral rights would not be forever preserved to the vendor. The government's right to become thereafter vested with the ownership of the minerals, depended entirely on the uncertain future. The contract contained specific provisions which would have permitted Leiter to maintain his mineral rights forever, or at least indefinitely. It is this Court's considered opinion that what the parties did in 1938 was to establish, in a mode not prohibited by law or public policy, a conventional or contractual prescription

as to the mineral rights and when the Legislature passed Act 315 a year and a half later, those mineral rights were still in effect. Likewise, at the time the Legislature passed the 1940 Act the government's rights to the minerals were just as contingent and uncertain as they were when Leiter executed the deed in 1938.

"*It is this Court's opinion that the language of Leiter's mineral reservation merely established the minimum term of the reservation, and not the maximum term. The maximum term, according to the language of Leiter's reservation, was left entirely indeterminate and indefinite.* [Emphasis mine.] Judge Porterie, in the Nebo case (90 F.Supp. 73, 89) discussed this very question and held:

" 'There are also specially reserved by and unto the Bodcaw Lumber Company of Louisiana, Incorporated, the vendor herein, all the oil, gas and other minerals, in, on and under all of the lands conveyed herein and which is subject to the two sales to the Good Pine Oil Company, Incorporated, mentioned above, *for a period of ten years* after the expiration of the rights of the said Good Pine Oil Company, Incorporated, under the laws of the State of Louisiana.

" 'At the termination of the ten (10) year period, if not extended, or at the termination of any extended period * * * the right to drill for and remove oil and gas and to mine and remove minerals shall terminate, and a complete fee in the land became vested in the United States.

\* \* \* \* \* \*

" 'It is clear that under the deed dated November 12, 1932, Bodcaw conveyed the mineral rights to Good Pine Oil Company in perpetuity. The last clause sets forth the *minimum term of the grant* and in no way seeks to restrict the terms of the conveyances.'

"It is therefore, this Court's decision that the 1940 Act applies to the 1938 reservation by Thomas Leiter and that the rights of Leiter were then and thereafter rendered imprescriptible.

"The final question is the constitutional issue which has been raised by the Defendants. It is not difficult for the Court to decide these constitutional questions as they are fully disposed of in both the District Court's and the Courts of Appeals' decision in U. S. vs. Nebo. As was decided in the Nebo decisions, the government at the time of the execution of the deed in 1938, as well as at the time the Legislature passed the 1940 Act, did not have any *vested* rights which were impaired or divested. The government's 'rights', as had already been declared in this opinion and as the District Court and the U. S. Court of Appeals held in the Nebo decisions, were entirely contingent and inchoate. In other words, all that the government had was a mere expectancy or a hope and the Legislature in

1940 was well within the State and Federal constitutional provisions in passing Act 315 dealing with mineral reservations which had been executed prior to that time. On appeal, in the Nebo case the Federal Court of Appeals declared:

" 'We conclude that this so-called "reversionary interest" is nothing more than a mere expectancy, or hope, based upon an anticipated continuance without change of the applicable laws of prescription and cannot be regarded as a vested right protected by the Constitution.'

"The only argument which the Defendants make on the constitutional points is to refer to Section 15 Article IV of the Louisiana Constitution which prohibits the passing of any law impairing the obligation of contracts or the divesting of vested rights. As this Court has already stated, the government did not have any vested rights in 1940 and it is difficult for this Court to perceive how the government's contract could be impaired if the government at that time did not have any vested rights arising out of the contract. Also, the decisions are uniform that in cases like this, Act 315 is valid as a reasonable exercise of the police power of the State. U. S. vs. Nebo Oil Co. [D.C.], 90 F.Supp. 73; affirmed [5 Cir.], 190 F.2d 1003 and the many decisions there cited.

"For these reasons it is this Court's opinion that Act 315 of 1940 applies to the min-

eral reservation contained in the deed of Thomas Leiter to the U. S. in 1938; that the mineral rights to be reserved were rendered imprescriptible by Act 315 of 1940; and that the Act of 1940 is not unconstitutional in any respect."

I respectfully dissent.

FOURNET, C. J., and HAMLIN, J., adhere to the views expressed in their written opinion; and, therefore vote for a rehearing in order that a judgment may be rendered accordingly. SUMMERS, J., joins in the view that a rehearing should be granted so that a judgment may be rendered on all of the issues involved in the case.