SCHOTT, Judge.
Pursuant to a contract entered into on December 3, 1969, between plaintiff as contractor and defendant Bern Mas as owner, plaintiff for the price of $56,994 was to furnish plumbing labor and materials at an apartment complex being constructed by Bern Mas. This litigation commenced with a petition in which plaintiff claimed damages of $5,207.60 on allegations that during construction, and while he was performing his contract, defendant caused heavy equipment to be driven over sewer and gas lines already installed by plaintiff, necessitating the reconstruction of the two lines at a cost to plaintiff of $1,095.38 for the sewerage line and $1,368.-77 for the gas line. Plaintiff also alleged that during the course of his performance of the contract and while the building was in the custody of defendant vandalism was perpetrated upon the premises which necessitated his replacement of copper pipe and various fittings at a cost of $2,743.25. Made a co-defendant as far as the foregoing claims are concerned was Aetna Insurance Company which had written a policy of builder’s risk insurance, protecting Bern Mas against the losses claimed.
On October 22, 1970, a supplemental petition was filed in which a balance of $6,149.40 was claimed on the original contract price, together with attorney’s fees as provided by the contract, on allegations that plaintiff had performed all of the work called for, that he had delivered to Bern Mas the necessary affidavit of completion and that he had not been paid the balance although the requisite delay of 31 days had run.
In response defendants denied liability for claims asserted in the original petition, and in response to the claim asserted in the supplemental petition Bern Mas alleged that plaintiff had performed his work improperly and had caused damage to defendant by delaying the entire project. Defendant alleged that it was required to “dig out and repair couplings on main water line at an expense of $400; remove and repair leaks in damaged sheetrock, caused by faulty installation of traps in bathrooms, $850,” and had incurred substantial expense in loss of water because of the defective couplings in the water main installed by plaintiff.
In the trial court the plaintiff was awarded a judgment against Bern Mas and Aetna for $1,056.49 on the claims in the original petition and for $5,289.69 with attorney’s fees of $1,057.92 against Bern Mas on the claim in the supplemental petition. This judgment followed the recommendation of the Commissioner of the Civil District Court for the Parish of Orleans before whom the case was tried and from whom the trial judge received an extended report of his findings.
From the judgment plaintiff alone has appealed.
In his report, the Commissioner treated the sewer and gas lines together and made the following disposition of this portion of plaintiff’s claim:
“Taking the sewer and gas lines together your commissioner is of the opinion that plaintiff failed to sustain the burden of proof in support of his contention that damage to these two lines was caused by the negligence of defendant or its employees. Plaintiff offered no corroborating evidence in support of his statements as to causation. And even assuming, for the sake of argument, that by a preponderance of evidence it could have been concluded that defendant was negligent, plaintiff has failed to substantiate the claims asserted by presentation of legal proof. The evidence presented was nothing more than self-serving documents which lacked necessary proof through the presentation of permanent records which were available but not produced.

“Your commissioner is of the opinion that plaintiff initially recognized these repairs as his obligation under the contract. He did in fact notify defendant, *848 in writing, of the amount that it cost his company to do the corrective work to the sewer line, and he requested of defendant to exert care in using heavy equipment over same. Also significant is the fact that some two months elapsed from the time that the corrective work was performed on the sewer and gas lines to the time when plaintiff billed defendant therefor on May 18, 1970. Your commissioner is of the opinion that when defendant questioned plaintiff’s bill dated May 12, 1970, which was submitted for the repairs caused by vandalism, plaintiff then decided to send bills for the sewer line and gas line rework.”
From our examination of the record we are convinced that the Commissioner fell into error in his considering the sewer and gas'lines as a common problem when the facts show that these items were completely independent with respect to cause as well as discovery and handling by the parties.
Plaintiff began his work on the contract on December 13, 1969, and on January 30, 1970, the sewer line was inspected and approved by the Sewerage & Water Board of New Orleans. On March 11, 1970, in a letter to defendant plaintiff discussed various complaints concerning the various plumbing facilities which had already been installed, and said the following:
“I would like to call your attention that this line was layed and installed to your specifications and grade lines were set by your superintendent.
* * * * *
“The heavy equipment that got bogged down on top of the main sewer ditch sunk the end of the line by the cabana U/2 inches. This line had to be removed and re layed.
“All the above work has been corrected by our company and re layed and inspected by your superintendent at a cost to our company of $589.00.
“I am going on record asking you to be extra careful with the sewer line and gas line when using heavy equipment, please use some precaution to protect the lines.
“If there is any more trouble of breaking or sinking of gas and sewer lines, this cost will have to be assumed by your company.”
Plaintiff’s records show that he had performed the work of replacing the sewer line between February 17 and February 27, 1970, and that the line was reinspected and approved by the Sewerage & Water Board on March 4.
Notwithstanding his letter of March 11, 1970, on May 18 plaintiff made his first demand for $1,095.58 for replacing this sewer line. His testimony, though vague, was to the general effect that after the sewerage line had been initially installed defendant had permitted heavy equipment to pass over the soft ground over the line causing the line to sink and to lose the proper grade even though line’s approval by the Sewerage & Water Board necessarily meant that it had been installed at the proper grade in the first instance.
Defendant’s president, John Mascaro, testified that after the sewerage line was installed, the ditch in which the pipe was layed stood open for the first week of February; that plaintiff was being so dilatory that he was holding up the entire project and on about the 10th of February he addressed a letter to plaintiff “putting him in default” and requesting him to close the open sewer line ditch, at which time plaintiff covered it up; that because he was concerned about the soil conditions which had been subjected to much rain, Mascaro, with the assistance of a civil engineer and laborer, determined that the fall of the line was incorrect; that upon his making this known to plaintiff, the latter agreed to correct it. At this point in time no mention whatsoever was made of the damage until plaintiff’s letter of March 11 in which he referred to the $589 he spent on corrective work. In a letter of March 13 to plaintiff Mascaro said: “I will agree that you may have spent $589 on the sewer *849 line in extra labor, but let it be understood it is not for any other reason than poor workmanship.”
With respect to this portion of plaintiff’s claim, when the record is analyzed his proof consists wholly of his own testimony and the raw certificates of the Sewerage & Water Board corroborating their inspection of the sewer line. Plaintiff asks that we accept the hypothesis that approval by the Sewerage & Water Board precludes any possibility that his work was improperly installed in the first instance and necessarily leads to a conclusion that any defects found in the line after such approval were not plaintiff’s responsibility but were necessarily the result of some external cause. Plaintiff testified that defendant was operating a bulldozer on top of the place where the line had been layed in connection with the removal of an old garage, and he contends that the damage must have occurred from the operation of this equipment. Plaintiff produced no expert testimony to support his position and his own testimony is vague and confused. We have concluded that there is no error in fact or law in the Commissioner’s findings that plaintiff failed to carry his burden of proof in connection with the cause of the defects in the sewerage line.
Furthermore, plaintiff, by his own action, waived any claim for that damage in his letter of March 11. Considering all of the circumstances with defendant making tests on the basis of which it took the position that the line was improperly layed and providing this information to plaintiff who then, without any authorization whatsoever from defendant, proceeded to make the corrections and at that time expressed a willingness to absorb the expense itself, it can hardly be said that the ends of justice would be served by permitting him to change his position two months later and demand payment for this portion of his claim. Finally, the inconsistency of the $589, which he says he incurred in his letter of March 11, with the $1,095.38 which he incorporated in his letter of May 18 was never explained and casts considerable doubt on the validity of same.
The gas line, however, is an entirely different problem, and while it is easy to understand why the Commissioner apparently confused the two claims relating to the gas line and the sewer line in his disposition of them because of the confusion in the testimony of the plaintiff, our own analysis of the record shows that these two claims are entirely independent of each other as to facts and when separated lead to different results.
This gas line was approved by the City of New Orleans Department of Safety and Permits on March 9,-1970. Plaintiff testified that on March 17 he had seen a crane in the immediate vicinity of the gas line which had been then backfilled and covered, and on the following morning he found that the line had been damaged. Upon his reporting these conditions to the City their inspector checked the line, condemned it and ordered that the entire line be dug up and replaced. This testimony is corroborated by a letter from the Chief Mechanical Inspector in which he notes that after the line was approved it was apparently damaged by heavy pieces of equipment “and must be uncovered and all joints must be checked, broken cement covering corrected and line must be reinspected and tested.”
When defendant became aware of this problem its answer was that it had originally wanted the gas line to be on the other side of the apartment complex but had been relocated at plaintiff’s request, that it had been placed on the wrong side of the sewer line and that it had been in close proximity to storm drains on which construction was to take place subsequently. It also took exception to the manner in which the line had been installed. With respect to the location of the line, defendant had the right to demand that the line be put in any location it desired and its acquiescence in the placement of the line *850 where plaintiff put it precluded it from subsequently complaining about this location. With respect to the manner in which the line was layed, it was approved by the City, plaintiff testified that the work was done properly, and defendant produced no expert testimony to show that plaintiff’s workmanship in this connection was defective. Furthermore, Mascaro testified that he met with plaintiff and discussed the relaying of the gas line and he offered to have defendant’s employees provide the labor to repair the gas line if plaintiff would provide the material. Plaintiff refused this proposal, and surely he was under no obligation to do so. At this point in time only a small proportion of plaintiff’s contract had been completed, and it could hardly be said that he was under any obligation to utilize defendant’s employees when his contract was to provide all labor and materials to perform the work undertaken by him. We perceive from Masca-ro’s testimony that he recognized that the responsibility for the gas line was not plaintiff’s, otherwise he would not have offered to supply the labor to correct the defects.
The corrective work on the gas line was performed between April 15 and April 24, and the line was reinspected and reap-proved by the City on April 24, 1970. Plaintiff’s itemized claim is as follows:
Mechanical labor 104 hrs. at $5.25 per
hr. ' $546.00
Material 157.84
Subtotal $703.84
25% for Fed. Social Security, La. Social
Security, Insurance and overhead 175.96
Subtotal $879.80
15% profit 131.97
Subtotal $1,011.77
34 hrs. labor and tractor time at $10.50
per hr. 357.00
Total $1,368.77
Except for the hourly charge for the labor of the mechanics at $5.25 per hour plaintiff’s testimony adequately supports the items included in his bill. An experienced plumbing contractor, he testified that his practice is to charge 25% over and above the cost of his labor and materials to cover clerical salaries, telephones, office expenses, truck expenses, tool expenses, insurance, social security, state employment taxes and other general overhead items. Likewise, he said that this charge and his 15% charge for profit are in line with the custom prevailing in the industry. His testimony stood uncontradicted on these points. However, he did testify that only one of his mechanics earned $5.25 per hour while the others received varying amounts between four and five dollars per hour. The Commissioner solved this problem on the vandalism aspect of the claim by allowing $5.25 per hour for one worker and $4.-50 per hour for the other workers on the same shift, and we accept this resolution as a practical one and well within the bounds of discretion afforded to the trier of fact. As a result, we find that plaintiff is entitled to recover the following:
Mechanical labor $498.00
Material 157.84
Subtotal $655.84
25% for overhead 163.96
Subtotal $819.80
15% for profit 122.97
Subtotal $942.77
Digging equipment and 'abor 357.00
Total $1,299.77
With respect to the vandalism aspect of the claim included in plaintiff’s original petition, during the week end of April 19, 1970, while the construction of the apartments was in progress, including the execution of the work undertaken by plaintiff, extensive damage was done to the premises by vandals, including damage to the plumbing fixtures. After negotiating with plaintiff concerning his undertaking the repairs of this damage, Mascaro in a letter to plaintiff on April 27 authorized him to proceed with the work and stated that “this work is to be performed on a cost plus basis.”
Plaintiff’s claim included labor for a period from April 27 until May 7. Plaintiff *851 admitted that all of his work had to he completed before the sheetrock was reinstalled over the places where he made repairs, and the Commissioner found that this sheetrock was completed on April 30, thereby making it impossible for plaintiff to have worked beyond April 29. For this reason, the Commissioner correctly limited plaintiff’s claim for labor to April 27, 28 and 29, and while plaintiff sought $5.25 per hour for four employees on each day, the Commissioner correctly limited plaintiff’s claim to that hourly figure for one mechanic and only $4.50 per hour for the other three. The Commissioner also allowed the plaintiff full recovery for materials used in these repairs, but he concluded that there was no basis under the evidence presented to allow an additional sum of 40% to the plaintiff on top of the labor and materials. We find otherwise. The letter from Bern Mas specifically contracted with plaintiff to perform the work on a “cost plus basis.” These terms can mean nothing else but plaintiff’s actual costs plus some reasonable profit. As has already been stated, plaintiff’s testimony that his additions of 25% for everhead expense and 15% profit were in line with the custom prevailing in the industry was uncontra-dicted by any other witness, and we hold that the trial court erred in denying plaintiff recovery for these amounts.
We conclude that plaintiff is entitled to the following recovery for the vandalism repairs:
Labor $ 450.00
Materials 606.49
Subtotal $1,056.49
25% for overhead 264.12
Subtotal $1,320.61
15% profit 198.09
Total $1,518.70
As to the action on the contract included in plaintiff’s supplemental petition, the Commissioner found that there was a balance due plaintiff of $6,147.40 but that defendant was entitled to a credit for $857.71 because of corrective work which, under the contract, plaintiff was obliged to perform but which, despite demands made upon him, plaintiff refused or neglected to perform, making it necessary for defendant to hire third parties to do the’work. Included in the Commissioner’s report, is the following:
“The evidence revealed that the complaints of early June were taken care of by plaintiff. However, other complaints were made to plaintiff which were not taken care of and for which defendant, then employed others. There was also some corrective work done through the employment of others by defendant without first giving plaintiff an opportunity to correct these under his contract warranty.”
The Commissioner then found that plaintiff’s testimony that he had a man available to do corrective work between June and September, 1970, was refuted by letters and telegrams from defendant to plaintiff, and by evidence to the effect that plaintiff was in Europe for a part of this time; that out of 36 bathrooms giving trouble plaintiff’s employee corrected only six; that other problems such as a loose coupling on a water line in a wall and seepage of water through joints in the driveway' were corrected by defendant but without notification to plaintiff relative to these problems; that in September, plaintiff was notified of additional problems, that he responded and corrected them and thereafter gave defendant his final certificate of completion in accordance with the contract. In October plaintiff was noti-vied about a leaking tub but failed to respond and that corrective work continued into 1971 without plaintiff being given an opportunity to perform the corrective work. The Commissioner concluded as follows:
“The evidence presented with respect to discrepancies is quite confused and contradictory. But after ferreting through this mass of confusion your commissioner is of the opinion that for work that *852 plaintiff was required to do under his contract and failed to perform after being notified thereof, defendant is entitled to a credit of $857.71.”
On painstaking review of this record we are unable to determine how the Commissioner arrived at this figure. Defendant’s president, Mr. Mascaro, testified that throughout the entire period when he was unable to secure plaintiff’s cooperation in remedying the defects he utilized services of R. J. Barousse and Lakeview Plumbing & Heating Co. to correct the work. Defendants have taken the position that when plaintiff refused to perform the corrective work properly they were no longer under any obligation to call on plaintiff to perform any work and it was unnecessary for them to notify plaintiff of defects after October when their last letter went unanswered. In the first place, defendant’s position is inconsistent with the fact that on September 16, 1970, a routine letter was sent by defendant to plaintiff, listing a number of items for correction and forwarding to plaintiff an affidavit with the request that it be notarized and returned for processing of the final payment under the contract. The contract required payment 31 days after this affidavit was filed. Plaintiff performed this corrective work and he returned the affidavit, but in violation of the contract defendant refused and neglected to pay the 10% re-tainage due plaintiff under the contract. The Barousse bills are dated January 31, February 28 and March 31, 1971, and there is a check to Barousse dated June 8, 1971. There are two bills included in defendant’s claim. Jefferson Rentals and Eddie’s Hardware, which both have to do with correction of a leaking water line early in 1971, and there are payments to one Mc-Elroy and a Joseph Carter in December, 1970. Apparently, the Commissioner was of the opinion that defendant was not entitled to these claims because it failed to place plaintiff in default and because it had breached the contract by failing to pay plaintiff the balance due him. From our review of the record we have reached the same conclusion. We find that the only item defendant is entitled to recover on the basis of the evidence it presented is the amount of $92.21 it paid to Lakeview Plumbing & Heating Company, and the judgment will be amended so as to award plaintiff the sum of $6,055.19 together with 20% attorney’s fees on the contract.
Accordingly, the judgment is affirmed but is amended so that there is judgment in favor of plaintiff, Theodore E. Swan, d/b/a T. E. Swan Plumbing Company, and against Bern Mas Enterprises, Inc. and Aetna Insurance Company in the sum of $2,818.47 with legal interest from date of judgment until paid; and there is judgment in favor of plaintiff and against Bern Mas Enterprises, Inc. for the additional sum of $6,055.19 plus $1,011.04 as attorney’s fees, with legal interest on the total due from judicial demand until paid and for all costs.
Amended and affirmed.